UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EMERALD INVESTMENTS LP, an Illinois partnership, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | 04 C 4285 |
| THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES; AXA CLIENT SOLUTIONS, LLC; and AXA FINANCIAL, INC., | ) ) ) ) ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION**

CHARLES P. KOCORAS, Chief District Judge:

This matter comes before the court on cross-motions for summary judgment. For the reasons set forth below, Plaintiff's motion is granted, and Defendant's motion is denied. The implied motion to strike the affidavits of Mark Hug and Naomi Weinstein is denied as moot.

## **BACKGROUND**

Plaintiff Emerald Investments, LP ("Emerald"), is a partnership based in Illinois that engages in trading of, among other things, variable annuities. Defendant Equitable

Life Assurance Society ("Equitable")[1] is a New York corporation that sells investment products, including variable annuities. One of the annuities Equitable offers is called "Equi-Vest." According to the Equi-Vest prospectus, the annuity was designed to be an investment tool for retirement savings and long-term financial planning. Despite this preference for nonvolatile investment practices, Equi-Vest annuitants could choose an available option called the Maximum Transfer Flexibility Option, which allowed an annuitant to execute an unlimited number of free transfers using the account during the contract year.

Around the end of April 1999, Emerald purchased two "Equi-Vest" annuities from Equitable. For each annuity, Emerald was issued a Certificate containing information specific to Emerald and about the annuity itself. Except for information such as the specific trustee, the provisions of the Certificates mirror those in Equitable's Group Annuity Contract No. AC 6725 ("GAC"). According to Data Page 1 of the Certificates, Section 1.09, and Section 9.01, the GAC is "the entire contract between the parties," and it governs the parties' respective rights and obligations. In Section 4.01, Equitable specified that "[a]ll transfers will be made on the Transaction Date." Section 1.23 defines "Transaction Date" as the business day on which Equitable's processing office receives a transaction request containing the information

---

[1] Equitable's prior codefendants, AXA Client Solutions LLC and AXA Financial, Inc., were dismissed from the case on August 4, 2004.

Equitable needed to complete the request in a form acceptable to Equitable. "Business Day" was in turn defined as any day that Equitable was open and that the New York Stock Exchange was open for trading. Section 4.01 also provides that "[t]ransfers are subject to the terms of Section 4.02 and to our rules in effect at the time of transfer." Section 4.02 states, *inter alia*, that Equitable had the right to change their transfer rules, as long as they provided advance notice.

Throughout the negotiations, Emerald emphasized its interest in investing in a fund that would permit frequent trades, particularly focusing on the unlimited number of transfers feature showcased in the Equi-Vest annuity. To further solidify Emerald's ability to enjoy this feature, it requested and received a guarantee from Equitable that, regardless of future limitations placed on the number of free transfers that could be made in Equi-Vest annuities, Emerald would be allowed at least 26 transfers per calendar year in its first Equi-Vest annuity. Two weeks thereafter, Equitable issued another letter extending the same guarantee to any future Equi-Vest annuity accounts Emerald opened, though the 26-transfer promise would be only effective for the year in which the change was first made. The parties refer to the letters containing these guarantees as the "Special Transfer Agreement" and agree that it is a valid modification of their contract.

Shortly after the first two annuities were funded, Emerald expressed an interest in opening a third. In response, Equitable examined the trading activity in the two open accounts and discovered that Emerald had been trading heavily. In part because of this volume, Equitable balked at issuing another Equi-Vest account and met with Emerald about its concerns. After the meeting, Emerald signed a letter stating that Emerald intended to maintain its investments in the annuity accounts at a level not to exceed 1% of the total assets of the accounts. It also stated that Emerald intended to execute an average of approximately 26 transfers per year.

After receiving the letter, Equitable issued a third annuity to Emerald. Rather than being another Equi-Vest annuity, it was a different product called the "Equitable Accumulator." This product also allowed an unlimited number of free transfers. The sections pertaining to transaction dates, business day, etc. were identical to those of the Equi-Vest annuity, as was the GAC identified as governing the parties' rights and obligations.

Throughout the following year, Emerald traded heavily in all three annuity accounts, sometimes in very hefty amounts. Although the parties do not specifically state all the methods Emerald used to place its transfer requests, they do indicate that at least some were made via facsimile, and the respective presentations strongly imply that Emerald used same-day methods frequently if not exclusively throughout the

parties' relationship of approximately 15 months. On September 13, 2000, Equitable stopped accepting trade instructions placed by any method that would allow the trade to be made the same day that Emerald placed the request. Instead, Emerald was told it must either place its requests via U.S. mail or wait 5 days between trades. Emerald offered to use personal delivery through a messenger, but Equitable insisted on mail delivery only. On September 19, Emerald sent a transfer request by fax, but Equitable rejected it and again reiterated the mail-only rule.

On October 13, Emerald asked Equitable to either allow same-day trades or return all of Emerald's money, which at that point had grown from the originally invested $36 million to $55 million. Equitable returned the $55 million less a $2.16 million surrender fee exacted because Emerald withdrew its money before it had been invested for the minimum period of seven years specified in the contract. Emerald sued for breach of contract and other causes of action. Equitable responded with a separate complaint arising out of the described events, seeking relief for common law fraud as well as rescission of the Certificates.

After discovery closed and a motion for partial summary judgment had been decided, Emerald discovered that one of its partners shared Equitable's New York citizenship at the time the complaint was filed, thus destroying complete diversity and eradicating the sole basis for federal jurisdiction. The complaint and suit were

accordingly dismissed, but before that ruling issued, Emerald removed the nondiverse partner and filed the complaint that commenced this action. Some further discovery ensued, and in July 2005 Emerald filed their portion of the motions under consideration here, which seeks a judgment that Equitable is liable for the contractual breaches in Counts I-III of the newly filed complaint. Equitable countered with a cross-motion for summary judgment in its favor on all seven counts of the complaint.

## LEGAL STANDARD

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. Proc. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). In seeking a grant of summary judgment the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. Proc. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." Celotex, 477 U.S. at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ.

Proc. 56(e). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); rather, "[a] genuine issue exists when the evidence is such that a reasonable jury could find for the non-movant," Buscaglia v. United States, 25 F.3d 530, 534 (7th Cir. 1994). When reviewing the record we must draw all reasonable inferences in favor of the non-movant; however, "we are not required to draw every conceivable inference from the record–only those inferences that are reasonable." Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir. 1991).

When parties file cross motions for summary judgment, each motion must be assessed independently, and denial of one does not necessitate the grant of the other. M. Snower & Co. v. United States, 140 F.2d 367, 369 (7th Cir. 1944). Rather, each motion evidences only that the movant believes it is entitled to judgment as a matter of law on the issues within its motion and that trial is the appropriate course of action if the court disagrees with that assessment. Miller v. LeSea Broadcasting, Inc., 87 F.3d 224, 230 (7th Cir. 1996). With these principles in mind, we turn to the parties' motions.

**DISCUSSION**

The gist of Emerald's motion is that the parties' contract did not permit Equitable to eliminate Emerald's ability to have a transfer completed on the same day that Emerald issued the request. According to Emerald, this action violated the terms of the Special Transfer Agreement (Count I), the Certificates, which in turn are those of the GAC (Count II), or both (Count III). Emerald contends that Equitable could not limit its ability to make trades with less than a 5-day turnaround.

Equitable insists that it was within its rights to require Emerald to wait 5 days between trades or to place its requests for transfers only through the U.S. mail. They contend that the terms of the parties' agreement were set out not only in the GAC and Certificates but also in the various prospectuses that issued to Emerald during the time of its investment. It is undisputed that the prospectuses described various methods by which trade requests could be placed and that, as of May 2000, it stated that Equitable could cut off different means of placing requests if it so chose. However, nothing in the GAC or Certificates incorporates the prospectus or states that it defines the relationship between Equitable and annuity investors. The only document prepared and executed in the manner specified for a valid modification is the Special Transfer Agreement. Thus, the parties' contract is comprised of three documents: the GAC, the Certificates, and the Special Transfer Agreement.

A court asked to interpret contractual obligations must, to the extent possible, give effect to the intent of the parties to the contract at the time the contract was formed. Evans v. Famous Music Corp., 807 N.E.2d 869, 872 (N.Y. 2004); USG Corp. v. Sterling Plumbing Group, Inc., 617 N.E.2d 69, 70 (Ill. App. Ct. 1993). If no facial ambiguity exists, the court construes the meaning of the agreement directly from the language used. Evans, 807 N.E.2d at 872; Air Safety, Inc. v. Teachers Realty Corp., 706 N.E.2d 882, 884 (Ill. 1999).

The GAC and Certificates clearly state that the transfer rules applicable to Emerald's annuities are contained in the data pages of the Certificates. Equitable has offered no argument that this language is ambiguous on its face, and there is no mention of the prospectuses in the transfer rules given in the data pages.[2] It is undisputed that Equitable accepted same-day transfer requests from the beginning of the parties' relationship and for 15 months thereafter. This indicates that both parties intended those request methods to be permissible under the contract. Moreover, the purpose of the contract was to provide Emerald with an investment vehicle that would

---

[2] Even if Equitable had argued that the silence of the agreement creates an ambiguity as to whether the provisions of the various prospectuses are included within the ambit of the contract, the argument would be unavailing. As the drafter of all three of these documents, Equitable could have brought the contents of the prospectuses within the ambit of the GAC or the Certificates, but they did not. Ambiguities in contractual language are construed against the drafter. Nebel, Inc. v. Mid-City Nat'l Bank of Chicago, 769 N.E.2d 45, 53 (Ill. App. Ct. 2003); Uribe v. Merchants Bank of New York, 693 N.E.2d 740, 743 (N.Y. 1998).

allow it to effectuate its trading strategy, which necessitated trades occurring more quickly than 5 days after the request. This fact provides a significant and weighty insight that the parties' intent at the time the contract was formed included Emerald being able to use same-day methods to communicate its trading requests. See Westmoreland Coal Co. v. Entech, Inc., 794 N.E.2d 667, 670 (N.Y. 2003); Schwinder v. Austin Bank of Chicago, 809 N.E.2d 180, 193 (Ill. App. Ct. 2004).

Equitable urges that the instituted change was within their contractual rights as stated in the GAC. Specifically, they point to the two sections of the agreement. The first, § 4.02, states that Equitable could change its transfer rules without the consent of the certificate holders after providing advance notice. Equitable argues that the changes it instituted were nothing more than a change of transfer rules, but there are two significant flaws with this contention. The contract states that the transfer rules applicable to the certificate in question could be found in the Data Pages of the certificate. There is no indication that the Data Pages were ever amended or supplemented to rule out same-day methods of placing trade requests. Furthermore, Equitable acknowledges that the rules were changed only as to certain certificate holders rather than across the board. The natural reading of the section to which they point indicates that it covers the former, not the latter. Pokora v. Warehouse Direct,

Inc., 751 N.E.2d 1204, 1209 (Ill. App. Ct. 2001); Messina v. Lufthansa German Airlines, 390 N.E.2d 758, 759 (N.Y. 1979).

Equitable also points to § 4.01, which specifies that transfer requests must be in a form acceptable to Equitable. While this provision undoubtedly exists, it does not cover the actions Equitable took. The instituted change was one not to the form of the request, but rather to the method by which it was made. Within the specific terms of the contract, what the change really affected was the definition of the term "Transaction Date" and particularly the word "receive" as used therein. Words in a contract are given their normal and ordinary meaning, unless the contract indicates that they should be interpreted in a different manner. See Pokora, 751 N.E.2d at 1209; Messina, 390 N.E.2d at 759. "Receive" means "to come into possession of; acquire." Webster's Ninth New Collegiate Dictionary 982 (1990). According to Equitable, it appears, this definition should be revised to mean "to come into possession of or acquire via U.S. mail." We cannot agree that this is a reasonable construction of the term as used in the contract. Instead, the most natural reading would indicate that the Transaction Date was the day on which Equitable came into possession of the trading request, regardless of the means employed to get it to them. Although it is conceivable in the abstract that the form of a request would change with a medium such as email or facsimile (though the chances of an appreciable difference with the latter are significantly reduced), the

undisputed facts show that Equitable would not accept even hand-delivered requests, which would be in a form identical to that sent through the postal system. The only difference would be in the timing of the receipt and the identity of the deliverer; it has nothing to do with the form of the request. The same holds true for the requirement that Emerald hold its positions for five days between trades. Thus, because Equitable changed the rules with respect to the timing and method of delivery, rather than the form of the request, we conclude that their actions were in breach of the unambiguous terms of the agreement requiring them to process requests on the day that they were received. Thus, we agree with Emerald that Equitable could not, consistent with the provisions of the GAC, restrict the methods by which Emerald could transmit trade requests and consequently lengthen the amount of time it took to process requests made. Accordingly, Emerald is entitled to summary judgment as to liability on Counts I-III of the Amended Complaint. However, as we stated above, the contract is comprised of the GAC, the Certificates, and the Special Transfer Agreement. Count I alleges a breach of the Special Transfer Agreement only, Count II alleges a breach of the Certificates only, and Count III alleges a breach of the contract as a whole. While this is acceptable as alternative pleading, we find that the parties had one contract, made up of three documents. Emerald may not, once it moves on to seek damages, attempt to obtain separate recovery for each count.

Equitable's cross-motion for summary judgment in its favor is predicated on a conclusion that its actions were completely consistent with its contractual obligations, so our decision mandates that the cross-motion be denied.

Lastly, we note that, during the briefing of the motions herein decided, Emerald took issue with two affidavits Equitable had filed as part of the evidence in support of its motion. Equitable treated this as an implied motion to strike the affidavits and responded as though a motion had been filed. Because neither affidavit proved necessary to our decision on either motion, the implied motion to strike them is denied as moot.

## CONCLUSION

Based on the foregoing analysis, Emerald's cross-motion for summary judgment is granted as to Counts I, II, and III of the Amended Complaint. Equitable's cross-motion is denied in its entirety. Emerald's implied motion to strike the affidavits of Mark Hug and Naomi Weinstein is denied as moot.

Charles P. Kocoras
Chief Judge
United States District Court

Dated: December 19, 2005